IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 16, 2025 Session

## IN RE SAWYER B.

**Appeal from the Chancery Court for Knox County**
**No. 202904-1     John F. Weaver, Chancellor**

———————————————

**No. E2023-01497-COA-R3-PT**

———————————————

This appeal concerns termination of parental rights. John W. and Kelli W. ("Petitioners") filed a petition in the Chancery Court for Knox County ("the Trial Court") against Crystal B. ("Mother") seeking to terminate Mother's parental rights to her minor daughter, Sawyer B. ("the Child"). The juvenile court previously found that Mother committed severe child abuse by failing to protect the Child's half-sibling from abuse by John B., a man Mother lived with. Mother did not appeal the juvenile court's finding. After a hearing, the Trial Court entered an order terminating Mother's parental rights on the ground of severe child abuse. Mother appeals, arguing among other things that she left John B. as soon as she could, although she remained with him for months after the termination petition was filed and continued to contact him. We find, as did the Trial Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence. We find further by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Glenna W. Overton-Clark, Knoxville, Tennessee, for the appellant, Crystal B.

Meghan A. Bodie, Knoxville, Tennessee, for the appellees, John W. and Kelli W.

# OPINION

## Background

The Child was born to Mother in March 2018. When the Child was ten weeks old, Mother lost custody of her. The Child was placed with Kelli W., Mother's relative by marriage. Kelli W. later married John W., who also is a Petitioner in this matter. The juvenile court found in a September 2019 order—entered *nunc pro tunc* to August 2019—that Mother perpetrated severe child abuse against one of her children not subject to this appeal by failing to protect him from the physical abuse of John B., a man Mother lived with. The juvenile court found, in part:

> The Court finds by clear and convincing evidence that Samuel [B.] is the victim of severe child abuse due to physical abuse administered by [John B.]. Samuel [B.] is further the victim of severe child abuse due to the failure of [Mother] to protect him from [John B.]. T.C.A. 37-1-102(b)(27)(A)(i). In January, DCS had a conversation with [Mother], which was approximately an hour and a half in length. The substance of the conversation was corporal punishment and whether it was an appropriate form of discipline. The Court finds that DCS provided [Mother] with the tools to protect her children, but she failed to do so.

Mother did not appeal the juvenile court's finding. On July 16, 2021, Petitioners filed a petition in the Trial Court seeking to terminate Mother's parental rights and to adopt the Child. Petitioners also sought to terminate the parental rights of Troy S. ("Father"), the Child's father.[1] In August 2023, the Trial Court heard the petition.

Mother testified first. At the time of trial, Mother lived with her mother. Before Mother moved in with her mother, she lived with John B. Mother has had a total of eight children, one of whom sadly died of natural causes and four of whom have been adopted. In May 2022, Mother gave birth to twins. Mother said that John B. is the twins' father. Mother left John B. on Thanksgiving Day of 2021. Asked about her employment status, Mother said she works at a convenience store. As for child support, Mother stated that she paid child support when the Child was in DCS custody, but that "once she got out through kinship foster care, I was -- stopped paying because they had closed it." Mother never offered Petitioners any monetary support. Regarding John B.'s abuse of one of her other children, Mother said: "I knew nothing about any abuse because the kids never told me about anything." Mother testified that she has since undergone therapy. Asked if she

---

[1] Father's parental rights were terminated as well, but he is not participating in this appeal. We mention Father only in setting out the background of Mother's case.

stayed with John B. following the abuse incident, Mother stated: "Yes, because he controlled the money, so I had no way out of finding a place to stay. He controlled everything." Mother continued: "The only other place for me to go was my mom's. But there was, like, nine people living there, so there was no room." Mother said that her children with John B. were unplanned. The last time Mother interacted with John B. was in March of that year when she asked him for gas money. Mother said that she never checked into a shelter. Asked what steps she had taken to regain custody of the Child, Mother said: "I'm away from [John B.]. I have a stable home. I have a stable job." Mother was on a waiting list for an apartment.

On cross-examination, Mother testified that she did not move in with her mother sooner because there was no room for her in her mother's home. Regarding the juvenile court's order, Mother said that her former attorney failed to communicate with her about an appeal. Mother was granted visitation with the Child in September 2022, but visitation did not start right away. Mother said this was because Kelli W. would not pay her share of the intake fee to allow Mother supervised visitation. Mother said this later changed, and she last visited the Child the Saturday before trial. She said the visit went "great."

Continuing her testimony, Mother acknowledged that she had no records showing that she asked for visitation and was denied. The Trial Court asked Mother why she waited to leave John B. until Thanksgiving of 2021:

> THE COURT: Guardian Ad Litem?
> Okay, ma'am. What I'm not clear on is, what was different -- I heard the explanation about Thanksgiving and that he would know something was coming up.
> What gave you so much -- the difference in courage to go live with your mother after Thanksgiving that year that you couldn't have done a year earlier? What changed? Why was it you could do it then, you couldn't do it a year before or two years before?
> THE WITNESS: Because it was always Thanksgiving with his family. And I told him that year I was doing Thanksgiving with mine because I never get to do stuff with my family.
> THE COURT: What was different about being okay to go there then and you couldn't have gone there a year before? What happened? What made it easier then than before?
> THE WITNESS: Because it was always his family.
> THE COURT: No, ma'am, I'm not talking about Thanksgiving. I'm talking about you're going to live with your mother. If you could do it then, why couldn't you do it before, a year before?
> THE WITNESS: Because I was afraid.

THE COURT: Okay. You weren't afraid when you went to go live with your mother at that time?

THE WITNESS: Yes.

THE COURT: Okay. Were you more afraid or less afraid?

THE WITNESS: I told him I would be back, knowing that I was lying to him, that I would be back when I wasn't, just so he would let me go. Because if he knew, he wouldn't have let me go.

THE COURT: Why couldn't you have told him that a year ago, "I'm going to my mother's," and then just stayed there a year ago?

THE WITNESS: Because he'd have been like, "Well, what's the reason? Why are you going there?" He'd question me.

THE COURT: But he didn't question you this time, the last time.

THE WITNESS: He did say that, when I told him that they were picking me up, he said, "So what? You can go run the roads?" And I'm like, "What are you talking about? I'm going to my brother's house."

THE COURT: Was there something that made it possible for you to do that when you did it that was not possible a year earlier or two years earlier or three years earlier? That's what I'm looking for. That's what I need you to tell me, if it exists.

MS. OVERTON [Mother's counsel]: Your Honor --

THE WITNESS [sic]: Not yet. Not now, unless it's an objection. If you have an objection, sure.

MS. OVERTON: I thought I could clarify.

THE COURT: No.

Tell me what it is. If there was such a thing, or if there wasn't tell me that.

THE WITNESS: I don't know why I didn't do it sooner.

Following this exchange, Mother's counsel asked Mother when space opened up for her in her mother's house. Mother said she believed it was 2019. Asked if there were other circumstances preventing Mother from leaving John B. even after there was room for her at her mother's house, Mother testified: "I was scared."

Kelli W., the Child's foster mother, testified next. In May 2018, Mother called Kelli W. to say that her children had been removed from her custody, and she wanted Kelli W. to take care of the Child. The Child has lived in Kelli W.'s home ever since. Kelli W. has taken the Child to her medical appointments. Before the termination petition was filed in July 2021, Mother had not visited the Child since March 2021. Mother never provided Kelli W. with any child support. Kelli W. testified that the Child is bonded to her and her husband. The Child calls Petitioners mom and dad. According to Kelli W., the Child says her visits with Mother are fun, but the Child does not talk about Mother afterward. Kelli

-4-

W. testified that she and her husband are financially able to take care of the Child. In Kelli W.'s view, it would be devastating for the Child to be removed from her home.

Elizabeth J., Mother's mother, testified last. Elizabeth J. testified that John B. was very controlling and mentally abusive to Mother during their relationship. Elizabeth J. said that Mother did not move in with her earlier because Elizabeth J.'s son and his family were living with her, so there was no room for Mother. Elizabeth J. testified to how Mother was able to leave John B. in 2021:

> Q. Did your son move out? Strike that.
> How long of time was it from the time your son moved out to the time [Mother] moved in?
> A. It wasn't very long. I just haven't kept up with the dates. I'm not --
> Q. A week, a month?
> A. It was several months. It had to be several months.
> Q. So it could have been 2021?
> A. Yes. This is '23. Yeah.
> Q. Explain to me what happened or how [Mother] was able to leave [John B.] in 2021.
> A. We were having Thanksgiving at my son's new place, and we invited her, but he was not allowed. John was not allowed to be there. She wanted to go for Thanksgiving. It was a big fight. You know, she had to argue with him and carry on, but we were able to pick her up, and I believe we picked her up on the corner, if I'm not mistaken, from his house, and we went for Thanksgiving. She came home with us, and she never went back.

In January 2024, the Trial Court entered an order terminating Mother's parental rights to the Child. The Trial Court found that the ground of severe child abuse had been proven against Mother by clear and convincing evidence. The Trial Court found further by clear and convincing evidence that termination of Mother's parental rights is in the Child's best interest. The Trial Court incorporated into its written order a transcript of its oral ruling, in which it found as follows:

> THE COURT: Okay. Thank you.
> Okay. This is as to whether the parental rights of [Mother] should be terminated as to [the Child], born [March 2018]. The petitioner, [Kelli W.], was related to [Mother] through marriage. She was Sawyer's aunt by marriage. [Kelli W.] has had Sawyer with her since Sawyer was ten weeks old. And her husband, current husband, [John W.], has had Sawyer with him and [Kelli W.] since he and [Kelli W.] married.

-5-

[Petitioners] filed their petition on [sic] July 21, 2021, and amended it to correct an incorrect spelling for the name of Sawyer's biological father. [Mother] has had eight children, one of which passed away from natural causes; two of [Mother's] children, twins, were born after this termination action was filed.

DCS filed a petition on May 30, 2018, regarding the care of Sawyer and her four older siblings, including Samuel. By order entered September 10, 2019, nunc pro tunc as of August 1, 2019, the juvenile court found, among other things, that Sawyer's brother Samuel was the victim of severe child abuse due to physical abuse by a [John B.], with whom [Mother] and the children lived, and that Samuel was the victim of severe child abuse by [Mother] due to her failure to protect him from [John B.].

Also, by the same order, which became a final order, the four older siblings remained in the custody of their father and their stepmother. Sawyer remained in the custody of DCS and in the care of petitioner [Kelli W.]. Sawyer's four older siblings were subsequently adopted by their stepmother. Sawyer's other two siblings were unborn at the time of the juvenile court's order. The juvenile court's order finding severe child abuse by [John. B] -- by [John B.] and [Mother] is a final order. [Mother] was represented before the juvenile court, and did not appeal.

The juvenile court order further sets out that DCS provided [Mother] with the tools to protect her children, but she failed to do so. The juvenile court's order was filed as Exhibit 1 at the hearing in this court. When the petition in this Court was filed, [Mother] was still living with [John B.]. Although [Mother] could have taken the children to live with her mother beginning in 2019, she could not explain to this Court why she did not do so beginning in 2019.

She referred to [John B.] as mentally controlling, as being mentally controlling, but in response to the Court as to what kept her from going to her mother's between sometime in 2019 and Thanksgiving in 2021, she testified, quote, I don't know why I didn't do it sooner, close quotes.

The Court finds and concludes by clear and convincing evidence that [Mother] has been found to have committed severe child abuse as defined in Tenn. Code Ann. § 37-1-102, under the prior order of the Knox County Juvenile Court, and the ground of severe child abuse for termination of her parental rights at Tenn. Code Ann. § 36-1-113(g) (4) has been established by clear and convincing evidence.

Next, the Court moves to whether termination of [Mother's] parental rights is in the best interest of Sawyer. Tenn. Code Ann. § 36-1-113(i) provides 20 factors for the Court to consider, including other relevant factors

in determining whether it is in the best interest of the child to terminate the parent's parental rights.

As to Factor A, the petitioners are the only parents that Sawyer has ever known. Removing her from them would be in direct opposition to this statutory factor.

The same applies to statutory Factor B.

As to Statutory Factor C, [Mother] has not demonstrated any continuity or stability in maintaining -- in meeting Sawyer's material, educational, housing, or safety needs.

As to Statutory Factor D, Sawyer has little or no attachment with [Mother], and there is little or no basis for any reasonable expectation that [Mother] could create such an attachment.

As to Statutory Factor E, [Mother] exercised visitation until March of 2021. She had also had some visits after this case was commenced. Other than [Mother] saying that a visit with Sawyer went well, there is no evidence of a positive relationship or attachment between Sawyer and [Mother].

As to Statutory Factor F, Sawyer would have no memory of [Mother's] household with [John B.], but it would certainly be a break in Sawyer's current continuity to remove her from [Petitioners].

As to Statutory Factor G, Sawyer, ten weeks old, would have no recollection of the household with [Mother] and [John B.].

As to Statutory Factor H, Sawyer is bonded to [Petitioners] as her parents.

As to Statutory Factor I, Sawyer has close relationships with [Petitioners'] children and nieces and nephews. She has no actual relationship with [Mother's] children with [John B.], the twins born in [2022].

As to Statutory Factor J, [Mother], as previously discussed, remained living with [John B.] until Thanksgiving of 2021. She had twins with him in [May] of [2022]. In March of 2023, [Mother] called [John B.] when her car ran out of gas. And [Mother] now has two twins to co-parent with [John B.]. Those were born, as I earlier stated, in [May 2022].

As to Statutory Factor K, [Mother] did not take advantage of the resources offered by DCS.

Statutory Factor L is not applicable to this case.

As to Statutory Factor M, [Mother] did not show any urgency in terminating her relationship with [John B.] so that Sawyer could hopefully have a safe home. As to Sawyer, who was ten weeks old when DCS got involved, this has been going on for five or six years.

As to Statutory Factor N, when the petition was filed, both [Mother] and [John B.], with whom she continued to live, were found to have

committed severe child abuse against Sawyer.  As to Statutory -- that was as to Samuel.

As to Statutory Factor O, since Sawyer has been ten weeks old and since January of 2018, which is recited in the juvenile court's order for the abuse -- and before Sawyer's -- and also going back before Sawyer's birth, [Mother] has never provided safe and stable care for Sawyer or her siblings born prior to the petition in this case.

As to Statutory Factor P, [Mother] has never demonstrated an understanding of the basic and specific needs required for the child to thrive, at least to the extent of giving them priority.

As to Statutory Factor Q, [Mother] has never shown or demonstrated the ability and commitment to create and maintain a home that meets the child's basic and specific needs in which the child can thrive.  [Mother] moved to her mother's after this petition was filed, and has gotten on a waiting list for an apartment.  But the matters giving rise to this case have been going on since at least May 30, 2018.

As to Statutory Factor R, the physical environment of [Mother's] home, when she -- when the petition was filed, was unhealthy and unsafe for Sawyer.  As of the time of the trial, the evidence was insufficient for the [determination] as to [Mother's] mother's home.  There is no evidence to indicate it would be unsafe; that Sawyer would be without her own room, and [Mother] would be sleeping on the couch.

And as to Statutory Factor S, [Mother] has never consistently provided more than token financial support for Sawyer.

As to Statutory Factor T, there was little or no evidence as to whether the emotional and mental fitness of [Mother] would be detrimental to Sawyer or would prevent [Mother] from consistently or effectively providing safe and stable care and supervision of Sawyer.  However, [Mother] testified that she had been under the mental control of [John B.], a child abuser, back when she and [John B.] resided together.

Considering these factors with respect to the facts and circumstances of this case, the evidence is clear and convincing that it is in the best interest of Sawyer to terminate the parental rights of [Mother].

The Trial Court stated that its judgment was not final because the termination petition as to Father's parental rights remained pending.  Petitioners filed a petition for default judgment against Father.  After a May 2024 hearing, the Trial Court entered an order terminating Father's parental rights to the Child.  Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following issues on appeal: 1) whether the Trial Court erred in finding the ground of severe child abuse; and 2) whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*,

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[4] Tenn. Code Ann. § 36-1-113(i).

-11-

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Trial Court erred in finding the ground of severe child abuse. On July 16, 2021, when the termination petition was filed, the ground of severe child abuse read as follows: "The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4) (West July 1, 2021 to June 30, 2022). A prior finding of severe child abuse by a juvenile court in dependency and neglect proceedings can be *res judicata* in later parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents a parent from re-litigating whether he or she committed severe child abuse. *Id*. Here, the juvenile court found in a September 2019 order that Mother committed severe child abuse against the Child's half sibling by failing to protect him from John B.'s abuse. Thus, Mother committed severe child abuse against "any child" as contemplated by the ground. *See* Tenn. Code Ann. §

36-1-113(g)(4) (West July 1, 2021 to June 30, 2022). Mother did not appeal the juvenile court's order, and it is final. In the appeal at bar, Mother attempts to re-litigate the juvenile court's finding of severe child abuse against her. However, the issue of Mother's perpetration of severe child abuse is *res judicata*. She may not re-litigate the issue in this Court. We find, as did the Trial Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

The next and final issue we address is whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest. On July 16, 2021, when the termination petition was filed, the statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there

is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

Mother argues that terminating her parental rights is not in the Child's best interest. In support of her argument, Mother makes several contentions, to wit: that Petitioners failed to present any expert testimony; that Mother has left John B.; that Mother has a suitable home; that Mother also has attempted to find alternative housing; that Mother has a stable job; that Mother has gone to therapy; that Mother was at times prevented by Petitioners from visiting the Child; that Mother paid child support while the DCS case was pending; that Mother's former attorney failed to communicate with her about the juvenile court's order so she could appeal it; and that Kelli W.'s testimony regarding her relationship with the Child was "self-serving."

Regarding a lack of expert testimony, the version of Tenn. Code Ann. § 36-1-113 applicable to this matter provides that "[e]xpert testimony is not required to prove or disprove any [best interest] factor by any party." Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022). Thus, Mother's point about a lack of expert testimony is neither here nor there. On the issue of child support, while Mother paid some child support early on before the juvenile court case closed, she never offered Petitioners any monetary support. Therefore, while it is a good thing that Mother has a stable job, the Child has not been a recent beneficiary of that. Likewise, it is good that Mother underwent therapy, but Mother fails to articulate how this has fundamentally changed her situation as it relates to the Child's best interest. Regarding the juvenile court's order, Mother again attempts to re-litigate a final order. The juvenile court found what it found, and the Trial Court did not err by relying upon it. On visitation, Mother argues that she was prevented from visiting more often with the Child. Nevertheless, the Trial Court did not find that Mother failed to visit per se nor was abandonment by failure to visit a ground for termination found against Mother. Instead, the Trial Court found that there was no evidence of a positive relationship arising between Mother and the Child as a result of the visits. In other words, that Mother engaged in visitation was good, but her visits did not have a significant impact on fostering a genuine relationship with the Child.

Perhaps the main issue in this case concerns Mother's relationship with John B. This case has its origins in John B.'s abusive actions toward one of Mother's children and Mother's response or lack thereof. Mother continuing to associate with a man found to have abused one of her children poses obvious risks to the Child's safety. Mother testified that she left John B. and, essentially, that the conditions necessitating the Child's removal no longer exist. However, the evidence undercuts Mother's assertion. Mother only left John B. months after the termination petition was filed in July 2021. In fact, following John B.'s abusive actions, Mother had children with him. Mother continued to contact John B., asking him for gas money as late as March 2023. The Trial Court questioned Mother about her reasons for staying with John B. as long as she did. Asked what changed

-15-

for her to leave John B. on Thanksgiving of 2021, Mother ultimately said: "I don't know why I didn't do it sooner." Clearly, the Trial Court did not credit Mother's explanation. We extend considerable deference to trial courts' credibility determinations. *See Kautz v. Berberich*, No. E2019-00796-COA-R3-CV, 2021 WL 1034987, at \*7 (Tenn. Ct. App. Mar. 18, 2021), *no appl. perm. appeal filed* ("We will not overturn a trial court's credibility determination—be it implicit or explicit—absent clear and convincing evidence to the contrary."). Conversely, even though Mother dismisses Kelli W.'s testimony as "self-serving," the Trial Court obviously credited Kelli W.'s testimony. The Trial Court found as relevant that "petitioners are the only parents that Sawyer has ever known," "it would certainly be a break in Sawyer's current continuity to remove her from [Petitioners]," and "Sawyer is bonded to [Petitioners] as her parents." It was the Trial Court's prerogative to assess the witnesses' credibility, and we find no clear and convincing evidence to overturn the Trial Court's implicit credibility determinations as to any of the witnesses. Moreover, Mother's testimony about why she waited so long to leave John B. presumes without justification or adequate explanation that moving in with her mother was literally the only solution she could have explored. Mother simply offered no credible reason for why she stayed with John B. as long as she did.

In the meantime, the Child is in a stable home with Petitioners. The Child calls Petitioners "mom" and "dad." Holding open the prospect of removing the Child from the only home she has ever known and placing her in Mother's care, with the uncertainties and risk posed by Mother's association with John B., is not in the Child's best interest. The Trial Court made findings as to each best interest factor. The evidence does not preponderate against any of the Trial Court's findings relative to the Child's best interest. We find by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Child's best interest. We affirm.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Crystal B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-16-